# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

SABRINA S. BARNES,

                                    Plaintiff,

            -v.-                                           5:15-CV-740
                                                          (GLS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

SABRINA S. BARNES, Plaintiff pro se
ELIZABETH D. ROTHSTEIN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, Senior United States District Court Judge pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with

General Order 18.

## I.    PROCEDURAL HISTORY

On February 13, 2012, plaintiff protectively filed an application for

Supplemental Security Income ("SSI"), alleging disability beginning March 15, 2009.

(Administrative Transcript ("T.") 135-41). The application was denied initially on May

8, 2012. (T. 64, 76-81). Plaintiff requested a hearing before an Administrative Law

Judge ("ALJ"), which was held by video conference on January 16, 2014 before

Administrative Law Judge ("ALJ") James G. Myles. (T. 32-63). On, February 12,

2014, ALJ Myles found plaintiff was not disabled. (T. 14-24). The ALJ's decision

became the Commissioner's final decision when the Appeals Council denied plaintiff's

request for review on April 14, 2015. (T. 1-5).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the

2

residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. <u>FACTS</u>

Plaintiff was 23 years old at the time of her application, and she was almost 26 years old at the time of the administrative hearing. (T. 23). She testified that she dropped out of school in the tenth grade because she had many problems with her home life and herself. (T. 36). She testified that she could read and write, but attended special classes and had an "Individualized Educational Program" ("IEP"). (T. 36-37). She previously applied for Social Security benefits in 2009, but did not appeal the denial. (T. 38). At the hearing, plaintiff stated that her "worst" medical problems are her Systematic Lupus Erythematosus ("SLE") and her fibromyalgia.[1] (T. 38). Plaintiff stated that she is getting intravenous medication for her SLE, and before that, she was getting Oxycodone for the fibromyalgia. She stated that she had tried many different types of medications, but was not able to take them because of adverse side effects and

---

[1] Plaintiff did not include her mental impairment at that time.

4

reactions. (T. 38-39).

On the morning of the hearing, plaintiff testified that she had a little bit of pain in her legs. (T. 39). Her morning routine included a hot bath, which helped relieve some of the muscle pain and swelling, before she got "out the door." (T. 39). She stated that her symptoms did not worsen until "pretty much the end of the day . . . maybe 5:00 or 6:00." (*Id.*) Plaintiff testified that, on the date of the hearing, she was "not taking any pain medication" because she was "trying to naturally deal with what's going on," due to the adverse reactions that she had in the past.[2] (T. 40).

Plaintiff estimated that she could sometimes drive for approximately one hour and walk one block, but had no problem with sitting. Plaintiff testified that she had weakness in her arms and a lot of pain in her head and her neck. (*Id.*) The pain in her "brain" caused the neck pain, which ran down her back "like a charley horse." (*Id.*) She relied a great deal on her fiancé. Plaintiff lived in an apartment with her fiancé and three small children. Plaintiff testified that she was not able to care for her own needs "at all times," and that her fiancé occasionally helped her with her personal care needs. (T. 41). Her fiancé also helped her care for her children, but plaintiff tried to assist "a little bit" when she could. (*Id.*) With respect to her mental health, plaintiff stated that "[i]t's a process," and that she was "working on it" herself. (T. 40). She stated that she had been in therapy for "over a year." It was a "slow process," but it was "going." (*Id.*)

Plaintiff stated that she woke up every day at 7:00 am. She woke the children up

---

[2] Plaintiff testified that when she first tried the intravenous treatment, she became "very ill." (T. 38). However, her doctors told her they did not think it was the medication, but she did not agree with their assessment. (T. 39). Thus, plaintiff stated that her medication was "an issue" that was "being fixed hopefully soon." (*Id.*)

for school, but her fiancé usually bathed them and took them to school. (T. 42). He

would come back to the apartment to cook plaintiff breakfast. (*Id.*) If plaintiff was able

to, she would try to help do the dishes or clean the house. (T. 42). Plaintiff testified that

she had a computer and did "lots of stuff on the computer." She had a Facebook

account, and she was familiar with "Google" and "Yahoo," but she normally played

games on the computer "all day." (T. 42). She owned a cellular telephone for

communication purposes only. (T. 43).

Plaintiff testified that she tried to "do things," but if she attempted to move more,

do the dishes, or sweep the floor, she would get pain in her arms and hands, and her feet

would swell. (T. 44-45). Plaintiff stated that she experienced swelling in her hands and

wrists. (T. 45). Plaintiff testified that she used a cane "every day" for various things,

particularly when she had to walk "for a long period of time." (T. 45). Plaintiff stated

that her hot baths helped the pain for three to five hours, but then the pain would start

again and she would go sit in a hot tub again. (T. 46). Plaintiff testified that her fiancé

helped her take care of the children, but when he was not available, his mother would

come over to assist plaintiff. (*Id.*) At the time of the hearing, plaintiff stated that her

new primary care physician was attempting to get a "home health aid[e]" to help

plaintiff at home in addition to getting plaintiff "management medication" for her pain.

(T. 46-47). Plaintiff testified that essentially, her fiancé either helped with, or did,

everything around the house for the plaintiff. (T. 47-49).

Plaintiff testified that she was seeing "Dr. Roper," a "psychiatrist,"[3] once per

---

[3] Although the plaintiff stated that Dr. Roper was a "psychiatrist," Dr. Roper is actually a
psychologist, "Virginia Roper, Ph.D. (T. 604).

week, but that Dr. Roper did not prescribe any medication for her. (T. 51).  Plaintiff was taking "Fluoxetine"[4] for her mental impairment that was prescribed by a previous physician, "who was fired from her practice because she made a medical mistake." (*Id.*)  According to plaintiff, the medication prescription was just "automatically renewing." (T. 51).  Plaintiff was also taking Meloxicam[5] for her "inflammation" and Albuterol for her asthma, but she was not taking any "pain" medication because of her "blood disorder."[6] (T. 52-53).  Plaintiff testified that she did not believe that she was "ready" to go back to work because she was "just not ready for that type of stuff just right yet." (T. 53).

Vocational expert, Dr. David Burnhill also testified at plaintiff's hearing. (T. 54-61).  After reviewing plaintiff's work history, the ALJ asked the VE to assume an individual with plaintiff's RFC (as stated below).  The VE testified that an individual with plaintiff's RFC would be able to perform the sedentary jobs of document preparer (2.8 million jobs in the national economy); telephone quotation clerk (one million jobs); and addresser (110,000 jobs). (T. 56-57).

---

[4] Fluoxitine is also known as Prozac and is a drug used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html.  The drug is also used to relieve the symptoms of premenstrual dysphoric disorder, including mood swings. *Id.*

[5] Meloxicam is a nonsteroidal anti-inflammatory drug ("NSAID"). https://www.drugs.com/meloxicam.html.  Meloxicam is used to treat pain or inflammation caused by rheumatoid arthritis and osteoarthritis. *Id.*  Plaintiff testified that she was not taking any "pain" medication.  However, she may have been referring to stronger pain medication or may not have considered this medication as "pain" medication.

[6] Plaintiff suffers from Ideopathic thrombocytopenic purpura ("ITP").  ITP is a bleeding disorder in which the immune system destroys platelets which are necessary for normal blood clotting.  https://www.nlm.nih.gov/medlineplus/ency/article/000535.htm.  The ALJ found that ITP was one of plaintiff's severe impairments. (T. 17).

Plaintiff's attorney asked whether plaintiff would be able to perform the stated jobs "successfully" if she had "anger issues" and a "borderline personality disorder," limiting her ability to work or be around other individuals "or even speak socially with other individuals . . . ." (T. 57). The VE asked what percentage of time would such limitations take plaintiff "off task," but plaintiff's counsel had difficulty expressing his question in "vocational terms." (T. 57-58). After some discussion, the VE ultimately testified that if the individual's limitations would put her off-task more than ten percent of the time then she would not be able to maintain competitive employment. (T. 60). The VE then stated that "[b]orderline personality disorder and anger issues is [sic] a very variable disorder, and I did not hear any testimony regarding that." (T. 60).

The record in this case is extremely long and consists of medical records from 2002 until 2013. The ALJ's decision provides a detailed statement of the relevant medical and other evidence of record. (T. 18-24). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.  ALJ'S DECISION

The ALJ found at step one of the disability analysis that plaintiff has not engaged in substantial gainful activity since February 13, 2012, the date of her SSI application. (T. 16). The ALJ found that plaintiff had the following severe impairments: ITP; lupus ("SLE"); fibromyalgia; anemia; osteoarthritis affecting the knees; kidney stones; anxiety; and borderline personality disorder, none of which rise to the level of Listed Impairments at step three. (T. 17-18).

The ALJ then found that plaintiff has the RFC to perform sedentary work, but must avoid climbing ladders, ropes, and scaffolds, but may occasionally climb small stairs and perform other postural activities. (T. 18). The ALJ determined that plaintiff must not engage in rapid head cycling, and she should have no concentrated exposure to pulmonary irritants, noise, or bright lights. She must be provided restroom access in the work area and is limited to unskilled work with only occasional face-to-face interpersonal contact. Finally, the ALJ found that plaintiff's work should not include team-based work, or frequent work with the public as part of her "critical" job duties. (*Id.*)

The ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms that plaintiff alleged, but that her statements concerning the intensity, persistence, and limiting effects of those symptoms was "not entirely credible." (T. 19, 21-22). In making these determinations, the ALJ weighed the medical opinion evidence and determined the weight to give the doctors' reports. (T. 22-23). At step five, the ALJ determined that plaintiff's impairments would prevent her from performing a "full range" of sedentary work and consulted a vocational expert ("VE"). Based upon a hypothetical question posed by the ALJ, the VE testified that there were a significant number of jobs in the national economy that plaintiff could perform. (T. 23-24). Thus, the ALJ determined that plaintiff was not disabled. (T. 24).

## V. <u>ISSUES IN CONTENTION</u>

Plaintiff raises the following arguments:

9

1.     The ALJ failed to properly evaluate plaintiff's credibility. (Pl.'s Br. at CM/ECF p.5) (Dkt. No. 22).

2.     The ALJ's RFC assessment is not supported by substantial evidence. (Pl.'s Br. at 6).

Plaintiff has attached documents to her brief which are dated subsequent to the Commissioner's final decision. (Dkt. No. 22 at 9-25). Plaintiff has also separately filed 192 pages of additional medical records, many of which are also dated after the Commissioner's final decision. (Dkt. No. 11). Plaintiff is pro se, and although she does not make any specific arguments regarding the "new evidence," the court will address the issue below as if she had made the proper request to consider new evidence that was not before the Commissioner. Defendant's brief does contain an argument in opposition to the court's consideration of the new evidence. (Dkt. No. 23 at 13-16). Defendant also argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Dkt. No. 23). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## VI. <u>NEW EVIDENCE</u>

### A.    **Legal Standards**

A case may be remanded to the Commissioner for reconsideration based on new evidence first submitted to the district court if the plaintiff is able to show that the new evidence "is material and that there [wa]s good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). To carry this burden, a plaintiff must show that "(1) the proffered evidence is new and not merely cumulative of what is already in the record; (2) the proffered evidence is material,

meaning that it is (a) relevant to [her] condition during the time period for which benefits were denied; (b) probative; and (c) reasonably likely to have influenced the Commissioner to decide her application differently; and (3) good cause exists for [her] failure to present the evidence earlier." *Mulrain v. Commissioner of Social Sec.*, 431 F. App'x 38, 39 (2d Cir. 2011).

## B.    Application

In this case, plaintiff has submitted a great deal of additional medical records, most of which have not been considered by the Commissioner. (Dkt. Nos. 11, 22 at 9-22, 22-1, 22-2).[7]  The records are "new" because they are all dated after the ALJ's decision, and most of them are dated after the Appeals Council issued the final decision of the Commissioner.  Because most of the documents were not in existence when the Commissioner issued the final decision, there is "good cause" for the failure to present the evidence earlier.  The court must therefore discuss the remaining factors – whether the evidence is relevant to the time period for which benefits were denied, whether the evidence is probative, and whether the evidence is reasonably likely to have influenced the Commissioner to decide plaintiff's application differently. *Mulrain, supra*.

The relevant time period in this case is from February 13, 2012, the date of plaintiff's SSI application, to February 12, 2014, the date of the ALJ's decision denying benefits. Although the new evidence post-dates the ALJ's decision, it still may be considered material if it shows that plaintiff's condition was more serious than previously thought or if the post-dated evidence discusses plaintiff's condition during

---

[7] Although there is a Dkt. No. 22-3, this filing consists of plaintiff's own handwritten notes, not medical records. (Dkt. No. 22-3).

the relevant period. *See Mulrain,* 431 F. App'x at 39-40 (citing *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004)). In *Pollard*, the court stated that new evidence may "disclose the severity and continuity of impairments" which preexisted, or it could identify additional impairments which could "reasonably be presumed to have been present." *Pollard*, 377 F.3d at 193-94 (quotation omitted). When a diagnosis emerges after the close of administrative proceedings that sheds light upon the seriousness of the plaintiff's condition, evidence of that diagnosis is "material" and justifies remand. *Lisa v. Sec'y of Dep't of HHS*, 940 F.3d 40, 44 (2d Cir. 1991). However, evidence of a deteriorating condition is not material if it is documented after the ALJ renders his or her decision. *Pearson v. Astrue*, No. 1:10-CV-521, 2012 WL 527675, at *12 (N.D.N.Y. Feb. 17, 2012).

Most of the medical records submitted by plaintiff are post-hearing progress notes and emergency room records, beginning in January of 2015,[8] almost one year after the relevant time period ended. (Dkt. No. 11). The records show that plaintiff has visited the emergency room frequently complaining of pain and other issues relating to her severe impairments. There are also records relating to the periodic administration of her SLE medication,[9] which requires admission to the hospital due to all the pre-

---

[8] One of Dr. Yu's records is dated March 10, 2015, but contains a review of his progress notes, dating to his first examination of plaintiff. (Dkt. No. 11 at 62-66). Although plaintiff did not supply the records to which Dr. Yu refers in his summary, clearly plaintiff was examined by Dr. Yu during 2014 because he cited specific dates that he examined plaintiff in 2014    2/11/14; 5/13/14; 7/28/14; 10/22/14; and 11/5/14. (*Id.* at 64-65).

[9] When it is administered, plaintiff's medication is administered by infusion    one dose per month for three months.

medication[10] that plaintiff must take. (Dkt. No. 11 at 13). The first dose was administered April 27-28, 2015; the second dose was administered May 5-8; and the third dose was administered June 2-3. (*Id.* at 13, 26-38, 39-50). However, the ALJ was aware of this practice based on records that were before him.

The court also notes that the ALJ was aware of plaintiff's frequent visits to the emergency room complaining of pain, but when plaintiff was examined, the objective findings were often minimal. The ALJ specifically noted that "treatment notes consistently show objectively normal findings following her examination." (T. 21). The same is true for the new evidence. On January 28, 2015, the progress notes state that plaintiff's SLE has been "in remission" since 2012 or 2013, and that plaintiff had normal range of motion. (Dkt. No. 11 at 55, 57). There are several references in the records to plaintiff's "normal" mood and affect. (*See e.g.* Dkt. No. 11 at 61, 80, 87, 89, 114, 123). Treating rheumatologist, Dr. Yu reported on March 10, 2015 that on July 28, 2014, plaintiff told him that her joint pain got "worse" after exercise, but Dr. Yu "encouraged her to continue doing it." (*Id.* at 65).

Plaintiff visited the emergency room on April 13, 2015 for "pain." (Dkt. No. 11 at 89). However, her physical examination showed "normal" range of motion and no tenderness. Her mood, affect, judgment, and thought content were "normal." (*Id.*) The records referred to a "lupus flare," with "generalized myalgias and arthralgias, but noted that plaintiff was "laughing and joking prior to discharge." (*Id.*) On April 14,

---

[10] The decision was made to give plaintiff her medication as an in-patient because of her allergic reaction to the medication and the need to give her several medications prior to the infusion. (Dkt. No. 11 at 18).

13

2015, plaintiff was examined by Dr. Yu, who, after reviewing plaintiff's background again, noted that plaintiff had back pain and arthralgias, but was "negative" for myalgias, joint swelling, and gait problems. (*Id.* at 93-97). When he conducted plaintiff's physical examination, her found that her muscle strength was "preserved" and was 5/5. (*Id.* at 96).

Plaintiff visited the emergency room again on April 17, 2015, complaining of fatigue, myalgia, arthralgia, rash, fever, and chills. (*Id.* at 104). Plaintiff was examined by Anthony F. Cerminaro, Nurse Practitioner ("NP"). (*Id.*) The emergency room progress note stated that plaintiff's medication was scheduled to be administered the following week, and it could not be done in the emergency room due to the premedication requirements. (*Id.*) Although plaintiff stated that she was unable to bear the discomfort in her back and legs, the physical examination noted that she appeared "comfortable," was in no "acute" distress, had a normal range of motion, no tenderness, no edema, normal muscle tone, normal coordination, and normal mood, affect, and behavior. (*Id.* at 107). Other than her "rash," plaintiff's examination was "wnl [within normal limits]," and she was "observed texting on her phone, and interacting with her friend in the ED - in no acute distress." (*Id.*)

Plaintiff went to the emergency room again on May 13, 2015, complaining of "generalized pain," but ultimately her physical examination showed a normal range of motion and normal mood and affect. (*Id.* at 118-20). Plaintiff saw Dr. Dana Savici, M.D., who stated that plaintiff's pain "could be multifactorial but SLE may play an important role." (*Id.* at 120). Plaintiff did have some trouble with the "PICC line"

14

which was inserted to assist in the administration of the medication, but on May 29, 2015, her physical examination noted normal range of motion, no edema, and no tenderness. (*Id.* at 132).

As stated above, most of the new evidence consists of more recent reports which lend themselves to the same analysis as the ALJ's analysis of the reports that were before him. To the extent that plaintiff's condition became worse after the relevant time period, the new evidence would not be material or probative of plaintiff's condition during the time period in question.[11] To the extent that the documents support the analysis of the ALJ, they would not have changed his decision.

Plaintiff has also filed a September 11, 2015 letter from Stacey P. Elliott, DO, "Resident Psychiatrist" at Upstate University Hospital. (Dkt. No. 22-2 at 6-7). The letter states that it is being written at plaintiff's request to "provide a brief explanation of borderline personality disorder, and the nature of this mental illness." (*Id.* at 6). Dr. Elliott states that she began seeing plaintiff in July of 2015, which is more than one year after the ALJ's decision, although Dr. Elliott states that plaintiff was previously "treated by two colleagues of [hers] since 2009." (*Id.*)

However, as defense counsel points out, there is no evidence that plaintiff was regularly treated by any physician for her mental impairments, other than to be prescribed medication by a primary care physician. In any event, Dr. Elliott's letter is a general discussion of borderline personality disorder and what symptoms "may" be

---

[11] Plaintiff's brief (Dkt. No. 22) addresses her current symptoms, and submits new evidence regarding these alleged symptoms. However, as stated above, the issue is plaintiff's limitations during the relevant time period, not her current condition if it has become worse.

present in certain cases. She specifically states that "[n]ot every person with BPD is unable to hold down a job. Some can work productively while their lives spiral out of control at home in other areas. Others with BPD struggle every day just go [sic] be at work, let alone work productively." (*Id.* at 7). After stating that "there is no one-size-fits-all scenario," Dr. Elliott stated

> Sabrina demonstrates mood instability, chronic feelings of emptiness, inappropriate intense anger, damaging impulsivity, and a pattern of unstable and intense interpersonal relationships. Sabrina manages to care for her family and young children productively, but relationships and responsibilities outside of the home and family unit spiral out of control.

(*Id.*) As the defendant points out, Dr. Elliott was not assessing plaintiff's limitations during the relevant time period, and describes current symptoms. To the extent that Dr. Elliott was correct that plaintiff was previously treated by her colleagues in 2009, there is no evidence of such treatment in the administrative record, and Dr. Elliott does not refer to any specific previous examinations, nor does she mention the names of the colleagues to whom she refers.[12] In addition, plaintiff told consultative psychologist Jeanne Shapiro, Ph.D. on April 6, 2012 that she was "not currently getting any

---

[12] The administrative transcript contains a report from Virginia Roper, Ph.D., whose address is the same as Dr. Elliott. (T. 603-604). Dr. Roper's report is dated October 31, 2013. (T. 604). Unfortunately, the question "How long has client been a patient of this practice?" was left blank, and later when describing plaintiff's clinical course, Dr. Roper states that "Sabrina has been a patient of this practice since December 20." (*Id.*) There is no year listed, and the court does not know whether the document has been copied badly or whether there was simply no year listed on the original document. The court notes that prior to Dr. Roper's report in the record is a "Pre-Screening Testing Summary," dated November 20, 2012, from the Center for Emotion and Behavior Integration, signed by Katherine Bonafide, MS, the Prescreening Coordinator. (T. 1088-89). It is possible that Dr. Roper began treating plaintiff in December of 2012, which would coincide with a November 2012 screening, but the court cannot make this assumption. In any event, there are no psychological reports from 2009.

outpatient mental health treatment." (T. 398). Plaintiff also stated that she "had prior outpatient mental health treatment in 2003 to 2004 with Dr. Keith a psychologist and in 2004 with a psychiatrist whose name [she] could not recall."[13] (*Id.*)

A review of Dr. Elliott's report indicates that it is unlikely that it would have affected the ALJ's decision, based upon the fact that the report is dated more than one year after the relevant time period, and is, for the most part, a general discussion of borderline personality disorder, with some discussion of the plaintiff's 2015 symptoms. There is no evidence in the record to support some of the extreme symptoms listed by Dr. Elliott. Plaintiff visited the emergency room many times in 2015 and during the relevant period, and for the most part, other than an occasional mention of depression, plaintiff's mood and affect were listed as "normal." Thus, the new evidence presented by the plaintiff is not material or probative and does not justify a remand to the Commissioner for its consideration. As stated by defendant, if plaintiff's condition has become worse, she may pursue a new application for benefits. The court will now turn to a discussion of the existing record and whether the Commissioner's decision is supported by substantial evidence.

## V. RFC/Treating Physician/Credibility

### A. Legal Standards

#### 1. RFC

---

[13] There are reports in the record from 2004-2006, from Dr. Robert M. Cavanaugh, from the Adolescent Medicine Consultation Center, when plaintiff was 16-18 years old. (T. 449-57, 461-66, 476-85). Dr. Cavanaugh appears to be a primary care physician, but spent a lot of time counseling plaintiff on her emotional issues and prescribing medication for her ADHD. However, these reports were written long before the onset date in this case.

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the

medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 416.929(c)(3).

B.    **Application**

1.    **Physical Limitations**

Turning first to plaintiff's physical limitations, there is no evidence that plaintiff is unable to perform the physical requirements of at least sedentary work.  Plaintiff testified that she had no problem sitting. (T. 40).  In fact, plaintiff testified that, during the day she sits "at the computer a lot," or she will "sit and watch TV." (T. 44).  On April 2, 2012, Dr. Kanyani Ganesh stated that plaintiff had full range of motion in her spine, upper body and lower body, she had "full strength" in her upper and lower extremities, her dexterity was "intact," and she had full grip strength bilaterally. (T.

396).  Dr. Ganesh noted no gross physical limitations with respect to sitting, standing, walking, or the use of her upper extremities. (T. 397).  Sedentary work requires only that the plaintiff be able to lift no more than ten pounds, with occasional lifting of articles such as docket files and small tools. 20 C.F.R. § 416.967(a).

On April 21, 2012, plaintiff went to the emergency room with back pain. (T. 406-409).  Upon physical examination, although plaintiff complained of severe pain, she had a normal range of motion and no tenderness or edema. (T. 408).  The doctor referred to plaintiff as a "young healthy female." (*Id.*)  Dr. Mohammad A. Hamdani ordered a CT scan which showed that plaintiff had a kidney stone. (T. 409).  She was discharged, and Dr. Hamdani noted that plaintiff could "return to work on 4/23/12." (T. 418).  In July of 2012, plaintiff developed knee pain and was referred to physical therapy, which plaintiff ultimately terminated because she believed that it was not helping her. (T. 435-47).  On July 31, 2012, the physical therapist noted that plaintiff had "no complaints of pain currently," however, she was not doing her exercises. (T. 445).  Instead, she was "on [her] feet with the kids and doing squatting and lifting and not wearing support during the day." (*Id.*)  This description of plaintiff's activities is not consistent with her claims of disabling pain and inability to engage with her children.  X-rays taken of plaintiff's knee showed no acute osseous injury and only minimal amounts of excess fluid. (T. 517).

On January 2, 2013, Dr. Yu examined plaintiff, who was complaining that she hurt all over her body, and although she noticed that her joints swelled, there was no swelling that day. (T. 896, 897).  Dr. Yu noted that plaintiff came in for an "urgent

visit," with diffused body aches and chest pain. (T. 897). Plaintiff told the doctor that she had severe back pain that was "10/10." (*Id.*) The doctor noted that "she certainly has fibromyalgia symptoms. (*Id.*)

However, on January 2, 2013, plaintiff's physical examination showed that plaintiff's muscle strength was "preserved," there was no active synovitis in both upper and lower extremity joints, and she was able to make good fist, grip, and pinch. (T. 899) Cervical and lumbar spine had full range of motion, muscle strength was "5/5 symmetrically," and on that day, there were "[n]o fibromyalgia tender points." (*Id.*) On December 18, 2012, plaintiff visited the emergency room, and was examined by Shoma Singh, M.D. (T. 870-74). Plaintiff presented with headache, abdominal pain, and knee pain and swelling. (T. 870). After reviewing plaintiff's impairments and noting all of plaintiff's subjective complaints, Dr. Singh examined plaintiff and found no edema, no active synovitis in both upper and lower extremity joints. (T. 871, 873). Dr. Singh also found that plaintiff could make a good fist, pinch, and grip. Her cervical and lumbar spines had full range of motion, and her muscle strength was 5/5 bilaterally. On that day, plaintiff had ten out of eighteen fibromyalgia tender points, but had "normal gait and stance." (T. 873).

While the ALJ agreed that plaintiff suffered from severe impairments, the issue was the extent of those limitations on plaintiff's ability to function. None of her treating providers limited plaintiff's lifting to less than 10 pounds.[14] To the extent that

_____

[14] On March 6, 2012, plaintiff completed a "Function Report," in which she states that "I take care of my house and 3 children from sun up to sun down. I care for a disabled child . . . ." (T. 195). She stated that she prepared healthy foods daily and prepared her own meals. (T. 196). She also stated that with help carrying the laundry baskets and getting the clothes together, she could do her cleaning

plaintiff claimed greater limitations - although she did not claim limitations regarding sitting - the ALJ found that plaintiff's statements were not completely credible. While plaintiff claimed to need a cane for walking, plaintiff's physical examinations consistently showed that plaintiff had normal gait and stance. (*See e.g.* T. 643, 873). Although plaintiff testified that she had "weakness" in her arms, there is absolutely no medical support for that statement. As stated above, almost every physical examination of the plaintiff showed full range of motion and full strength in her upper extremities. The ALJ correctly noted that, notwithstanding her numerous impairments, "treatment notes consistently show objectively normal findings following her examinations." (T. 21).

The ALJ discussed his credibility finding extensively, and stated that "[w]hile I acknowledge that the claimant's testimony regarding her ability to engage in the aforementioned tasks was relatively limited, she was not so limited as to preclude her from participating in all work activity." (T. 21). The ALJ even addressed plaintiff's claim that she needed the help of her fiancé to do many things, but noted that there was insufficient evidence in the record to suggest that she would be incapable of engaging in work "at a level consistent with her [RFC]." (T. 21-22). The ALJ also evaluated plaintiff's adverse reactions to her medications, which he found was "credible," but at the time of the hearing, plaintiff testified that she was not taking a lot of medication, "including pain medication." (T. 21). Based on the medical record, this court finds that

---

and laundry. (T. 197). Plaintiff states that she needs help cleaning floors, dusting, and disinfecting the house. (*Id.*) Plaintiff also stated that she gets out of the house "every day," and that she drives and rides in a car. (T. 197). Plaintiff states that she can lift certain things with a little help, that standing bothered her "after a long period of time," but walking and sitting were "ok." (T. 199-200).

the ALJ's determination is correct. Thus, the ALJ's finding that plaintiff can perform the physical requirements of sedentary work is supported by substantial evidence, and the ALJ's credibility finding regarding plaintiff's limitations is also supported by substantial evidence.

## 2.    Mental Limitations

The ALJ took plaintiff's mental limitations into consideration when he determined her RFC. He limited plaintiff to unskilled work, with only occasional "face-to-face interpersonal contact" and without "team-based" or frequent work with the public as part of her critical job duties. (T. 18). He included the limitations in the hypothetical question to the VE. (T. 55-56). In making his determination, the ALJ gave consultative psychologist Dr. Shapiro great weight, while giving treating psychologist Dr. Roper "little weight." (T. 22). Although Dr. Roper's evaluation was "current," there was "little medical treatment to substantiate her opinion." (*Id.*) Dr. Shapiro found that plaintiff could follow and understand "simple instructions and directions and perform simple tasks independently." (T. 401). While plaintiff might have "difficulty" consistently maintaining attention and concentration due to ADHD, she would be "able to maintain a schedule." (*Id.*) She could learn some tasks, and while some new tasks might be limited, she could perform some complex tasks independently and make appropriate decisions. (T. 401). Dr. Shapiro stated that plaintiff found it "difficult" to relate to others, and might have "some" difficulty dealing with stress. (*Id.*)

The ALJ's RFC is consistent with Dr. Shapiro's determination. Because plaintiff has "difficulty" dealing with others and had issues with stress, the ALJ limited plaintiff

to "unskilled" work with only "occasional" face-to-face interpersonal contact, and her work should not include any team-based or frequent work with the public. The court notes with respect to attention and concentration, plaintiff testified that she spent all day playing the "Sims" game on the computer.[15] (T. 42). Such activity is inconsistent with an inability to pay attention or to learn tasks.

The ALJ's decision to give Dr. Roper's October 31, 2013 "Mental Health Report" little weight is supported by substantial evidence. Dr. Roper checked a series of boxes and included some narrative explanations for her choices. (T. 603-604). Dr. Roper checked that plaintiff had "Anergia."[16] The explanation stated that the plaintiff "reports" that she has difficulty "engaging" with children. (T. 603). However, plaintiff wrote in her function report that she cared for her children from sun up to sun down, and took them to school every day, although she testified at the hearing that her fiancé took them to school. (T. 42, 199).

Although Dr. Roper stated that plaintiff's mood was "anxious" and "angry," when plaintiff visited her physicians, they noted mostly that her mood, affect, and behavior were all normal. (T. 782, 842). Although Dr. Roper states that plaintiff's impulsivity is "uncontrollable," there is no such statement anywhere in the record, and no description of any examples of plaintiff exhibiting uncontrollable impulses. Dr. Roper noted that plaintiff had "passive" thoughts of suicide. While there is some

[15] "The Sims" is a "strategic life-simulation video game," which simulates the daily activities of one or more virtual people in a suburban household." https://en.wikipedia.org/wiki/The_Sims_(video _game).

[16] Anergia is the abnormal lack of energy, one of the negative symptoms common to depression. http://www.merriam-webster.com/medical/anergia.

discussion of thoughts of suicide in the record, it is clear that plaintiff generally denied suicidal ideation or other thoughts of self injury. (T. 407, 505, 509, 898). Dr. Roper then states that plaintiff "describes" some limitation to working with others, and "reports" difficulty managing her emotions. (T. 604). Dr. Roper states that plaintiff would have "some" difficulty interacting appropriately with co-workers due to anger management problems. (T. 604). The court notes that the ALJ also found that plaintiff would have difficulty relating with others and thus, placed a limitations on interpersonal contact in his RFC. The ALJ specifically noted that he took these limitations into account in making his RFC determination. (T. 22). Thus, to the extent that Dr. Roper's report could be interpreted as more restrictive, such findings are inconsistent with the record as a whole, and the ALJ was justified in giving her "Mental Health Report" little weight.[17]

Because the ALJ's RFC determination was supported by substantial evidence, his hypothetical question to the VE contained the appropriate restrictions based on his analysis of the record, and the VE's determination that plaintiff could perform substantial gainful activity during the period in question is also supported by substantial

---

[17] On November 20, 2012, plaintiff was evaluated by Katherine Bonafide, MS, a pre-screening coordinator for the Center for Emotion and Behavior Integration. (T. 521-23). Ms. Bonafide notes a variety of "possible" diagnoses based on plaintiff's interview, including Borderline Personality Disorder. (*Id.*) Ms Bonafide is not an acceptable medical source for purposes of the regulations, and noted that her results were based on "self-report" and "interview based screening." (T. 523). The ALJ mentioned Ms. Bonafide's report with respect to the diagnosis of Borderline Personality Disorder, but there is no indication that plaintiff underwent any mental health treatment as a result of Ms. Bonafide's screening. The ALJ did find that Borderline Personality Disorder existed as a severe impairment, but evaluated and weighed Dr. Roper's more recent opinion. The regulations provide that only "acceptable medical sources" may "establish" an impairment, while evidence from "other" sources *may* be considered to show the severity of the impairment and how it affects the individual's ability to work. 20 C.F.R. §§ 404.1513(a), (d); 416.913(a), (d).

evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: July 11, 2016

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**